UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY <br> 1333 North Oracle Road <br> Tucson, AZ 85705, <br> <br> FLORIDA BIODIVERSITY PROJECT <br> 7097 65th Street N. <br> Pinellas Park, FL 33781, <br> <br> NATURAL RESOURCES DEFENSE COUNCIL <br> 1200 New York Ave., N.W., Suite 400 <br> Washington, D.C. 20005, <br> <br> BRIAN SCHERF <br> 1060 Tyler Street <br> Hollywood, FL 33019, <br> <br> ROSALYN SCHERF <br> 1060 Tyler Street <br> Hollywood, FL 33019, <br> <br>       Plaintiffs, <br> <br>     v. <br> <br> KENNETH SALAZAR, Secretary <br> U.S. Department of the Interior <br> 1849 C Street, N.W. <br> Washington, D.C.  20240, <br> <br> SAM D. HAMILTON, Director <br> U.S. Fish and Wildlife Service <br> 1849 C Street, N.W. <br> Washington, D.C.  20240, <br> <br>       Defendants. | No. 1:09-cv-01684 (RMC) |

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. This suit challenges the decision of the U.S. Department of the Interior's Fish and Wildlife Service ("FWS" or "Service") to dramatically reduce – by more than 100,000 acres, or almost 60% – the amount of critical habitat designated for the critically imperiled Cape Sable Seaside Sparrow ("Sparrow"). Although the Service determined more than two decades ago that the Sparrow's original critical habitat designation was insufficient to provide for the species' survival and recovery and, in response to this Court's earlier Order that the agency revise the critical habitat, the agency identified more than 150,000 acres suitable for critical habitat designation, 71 Fed. Reg. 63,980 (2006) ("Proposed Critical Habitat Rule"), the FWS ultimately excluded almost <u>half</u> of this amount – including all habitat west of Shark River Slough, which the FWS had repeatedly declared to be essential for the species' survival.  72 Fed. Reg. 62,736 (2007) ("Final Critical Habitat Rule").  The FWS's revised and reduced critical habitat designation for the Sparrow is not based on the best scientific data available, fails to protect habitat that is necessary to the species' conservation, and is otherwise arbitrary and capricious in violation of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, <u>et</u> <u>seq</u>., the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and this Court's prior ruling.  <u>See</u> <u>Biodiversity Legal Foundation v. Norton</u> ("<u>BLF I</u>"), 285 F. Supp. 2d 1 (D.D.C. 2003).

**JURISDICTION**

2. This Court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(g) and 28 U.S.C. § 1331.

## PARTIES

3.      Plaintiff Center for Biological Diversity (the "Center") is a non-profit corporation dedicated to the preservation, protection, and restoration of biodiversity, native species and ecosystems.  The Center – which merged with and is a successor in interest to the Biodiversity Legal Foundation ("BLF"), the lead plaintiff in BLF I – has over 44,000 members worldwide.  The Center has offices in Tucson and Phoenix, Arizona; Silver City, New Mexico; Washington, D.C.; San Francisco, Los Angeles, and Joshua Tree, California; and Portland, Oregon.  Staff and members of the Center have recreational, aesthetic, environmental, and scientific interests in the Sparrow and its habitat, and use and will continue to use such habitat for recreation and environmental activities, including looking and listening for and studying Sparrows in the wild.  The FWS's failure to designate adequate critical habitat for the Sparrow, including its decision to exclude habitat that is essential to the species' survival and recovery, injures the Center and its staff and members by increasing the likelihood that Sparrow habitat will be destroyed and the species will become extinct.

4.      Plaintiff Florida Biodiversity Project ("FBP") is a non-profit organization incorporated under the laws of Florida.  The FBP was founded to promote the preservation of native plants and animals in Florida, with a particular emphasis on species in south Florida, including the Sparrow, and their habitats.  The FBP's board members recreate in the Sparrow's habitat and view the species in the wild and plan to continue doing so in the future.  The FWS's failure to designate adequate critical habitat for the Sparrow injures the FBP and its board members by increasing the likelihood that Sparrow habitat will be destroyed and the species will become extinct.

5. Plaintiff Natural Resources Defense Council, Inc. ("NRDC") is a national, not-for-profit membership corporation with approximately 450,000 members, including approximately 23,000 in Florida. NRDC is dedicated to the preservation, protection, and defense of the environment, public health, and natural resources. NRDC is actively involved in efforts to protect and restore the Everglades, including specifically Everglades National Park. NRDC also works to ensure compliance with and enforcement of the Endangered Species Act both with respect to the Everglades and nationwide. NRDC members have recreational, aesthetic, and scientific interests in the Sparrow and its habitat, including in Everglades National Park and Big Cypress National Preserve, and enjoy visiting these areas and seeing and looking for the Sparrow in the wild. The FWS's failure to designate adequate critical habitat for the Sparrow injures NRDC and its members by increasing the likelihood that Sparrow habitat in the Everglades will be destroyed and the species will become extinct.

6. Plaintiffs Brian and Rosalyn Scherf reside in Hollywood, Florida. Mr. and Mrs. Scherf are board members of the FBP, and through the FBP and other organizations have worked for several decades to protect native species and their habitats in southern Florida. They frequently hike or camp in southern Florida, enjoy seeing and looking for the Sparrow in the wild, and will continue these activities on a regular basis in the future. Mr. and Mrs. Scherf have recreational, aesthetic, and scientific interests in the Sparrow and its habitat, including Everglades National Park and Big Cypress National Preserve, all of which are being injured by the Service's failure to designate adequate critical habitat for the Sparrow because this failure has increased the likelihood that Sparrow habitat will be destroyed and the species will become extinct.

7.      Defendant Kenneth Salazar is the Secretary of the Interior and has ultimate responsibility for the Department of the Interior and agencies within the Department, including the FWS.

8.      Defendant Sam Hamilton is the Director of the FWS, the agency within the Department of the Interior responsible for implementing the ESA, including making critical habitat determinations such as the one at issue in this case.

## STATUTORY FRAMEWORK AND FACTS GIVING RISE TO PLAINTIFS' CLAMS

**A.      The Endangered Species Act**

9.      Prompted by the "esthetic, ecological, educational, historical, recreational and scientific value" of all of the country's species of fish, wildlife and plants, 16 U.S.C. § 1531(a)(3), Congress enacted the ESA to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." Id. § 1531(b). Under the ESA, the term "conservation" means the use of "all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided [by the ESA] are no longer necessary" – that is, to recover species so that they no longer need ESA protection. 16 U.S.C. § 1532(3). The Act imposes duties on the Secretary of the Interior, which have been delegated to the Director of the FWS. 50 C.F.R. § 402.01(b).

10.     The ESA requires the Secretary to issue regulations listing species as endangered or threatened based on the present or threatened destruction, modification, or curtailment of a species' habitat or range; overutilization for commercial, recreational, scientific, or educational purposes; disease or predation; the inadequacy of existing regulatory mechanisms; or other natural or manmade factors affecting the species' continued existence. 16 U.S.C. § 1533(a)(1).

A species is endangered if, based on one or more of these factors, the species is "in danger of extinction throughout all or a significant portion of its range." Id. § 1532(6).

11. Section 7 of the ESA requires that all federal agencies "insure" that their actions neither "jeopardize the continued existence" of any listed species nor "result in the destruction or adverse modification" of a species' "critical habitat." 16 U.S.C. §1536(a)(2).

12. "Critical habitat," in turn, includes (a) those areas occupied by a species at the time of its listing that contain the "physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection;" and (b) those areas outside the area occupied by a species at the time of its listing that the Secretary has determined are "essential for the conservation of the species." Id. § 1532(5)(A). The Act requires the Service to designate critical habitat concurrently with listing a species and "from time-to-time thereafter as appropriate" to revise the critical habitat designation. Id. § 1533(a)(3).

13. In making critical habitat determinations FWS regulations require the agency to "focus on the principal biological or physical constituent elements . . . that are essential to the conservation of the species." 50 C.F.R. § 424.12(b)(5). These "constituent elements" may include "roost sites, nesting ground, . . . feeding sites, seasonal wetland or dryland, water quality and quantity, . . . vegetation type, . . . and specific soil types." Id.

14. The ESA requires the Secretary to make critical habitat designations "on the basis of the best scientific data available and after taking into consideration the economic impact, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). An area otherwise appropriate for critical habitat designation may be excluded from critical habitat only if the Secretary "determines that the benefits of such exclusion

outweigh the benefits of specifying such area as part of the critical habitat." Id.  Even under those circumstances, the area still must be designated if the Secretary "determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned." Id.

15. Once critical habitat is designated, section 7 of the ESA requires all agencies, in consultation with the FWS, to "insure that any action[s] authorized, funded, or carried out" by such agencies are "not likely to jeopardize the continued existence of any endangered species [or] result in the destruction or adverse modification" of any designated critical habitat.  16 U.S.C. § 1536(a)(2).

**B.    The Cape Sable Seaside Sparrow**

16. The Cape Sable Seaside Sparrow was designated an "endangered" species more than forty years ago.  Among the most critically imperiled songbirds in the United States, the FWS has described the Sparrow as facing a "significant risk of imminent extinction."  FWS Multi-Species Recovery Plan for South Florida ("MSRP"), at 4-356.  The species' population declined by almost 50% between 1992 and 2006.

17. The Sparrow is found in and near parts of the Everglades National Park and Big Cypress National Preserve in southern Florida that contain "marl prairie," or freshwater short-hydro period prairie – areas characterized by dense, clumped grasses as well as open spaces.  The species is particularly dependent on the hydrology of the marl prairie for survival, using the dry season as an opportunity to nest and breed, spending most of the time on the ground and well hidden within low brush.  See Balancing on the Brink: The Everglades and the Cape Sable Seaside Sparrow ("Balancing on the Brink") at 1, 7 (1997 joint report of the FWS and National

Park Service); see also Proposed Critical Habitat Rule. The Sparrow is a short-lived species, with an average life span of two to three years. This short life span means the Sparrow requires "favorable breeding conditions in most years to be self-sustaining and cannot persist under poor conditions for extended periods." Id.

18.     There are six spatially distinct subpopulations across the southern Everglades where Sparrows currently occur. One of these subpopulations is located west of the Shark River Slough, on the Western side of Everglades National Park.

19.     As the FWS has explained, the hydrology of these areas is critical for the species' survival, because "[i]n addition to directly affecting the sparrow and its ability to forage, move within habitat, and nest, hydrologic patterns largely dictate the plant community composition, and even the fire frequency." Id. Accordingly, hydrologic changes have posed the primary threat to the Sparrow's survival.

20.     Man-made hydrological changes in the area have been largely brought about through projects of the Army Corps of Engineers' Central and Southern Florida Project ("C & SF"). See MSRP, at 4-356 to 4-357. This flood control project has caused massive disruptions of the natural hydrology in Southern Florida, resulting in the flooding of some areas of the Sparrow's habitat, and the drying out of other vital areas. Id.

C.      **The Sparrow's Critical Habitat Designation And The Service's Recognition That The Designation Must Be Revised**

21.     The FWS designated more than 190,000 acres of critical habitat for the Sparrow in 1977. 42 Fed. Reg. 40,685 (1977). Several years later the agency issued a Recovery Plan for the species in which the FWS recognized that the critical habitat "requires review" because the

"area included in the presently designated Critical Habitat . . . does not reflect current occupancy or needs of the sparrow." Cape Sable Seaside Sparrow Recovery Plan ("1983 Plan"), at 33.

22. More than fifteen years later, in 1999, the FWS issued a Multi-Species Recovery Plan ("MSRP") for South Florida listed species, including the Sparrow. In that Recovery Plan the agency once again recognized that "[p]resently designated critical habitat does not adequately encompass the areas occupied by core populations and must be re-evaluated," and committed to "review[ing] and revis[ing] the current critical habitat designation" for the species. According to the Recovery Plan the critical habitat should, at a minimum, include habitat west of Shark River Slough that supports one of the two core subpopulations, and should include an analysis of wintering habitat requirements. MSRP at 4-368.

23. The same year the MSRP was issued, the BLF and others submitted a petition to the FWS requesting a revision of critical habitat, citing the FWS's own finding that the Sparrow's critical habitat "requires significant review and redesignation." MSRP, at 4-348. The petition specifically called for protection of the vital habitat west of Shark River Slough. In response to the petition, FWS published a positive "90-day finding" that the petition appeared to be warranted, 65 Fed. Reg. 42316 (2000), and subsequently a "12-month finding" that a revision to the critical habitat should proceed. 66 Fed. Reg. 53573 (2001). Nonetheless, the agency neither made the revision nor even established a timetable for doing so.

**D.  Plaintiffs' Effort To Force The Agency To Revise The Critical Habitat Designation And The Agency's New Critical Habitat Rule**

24. Conservationists, including several of the plaintiffs here, filed a lawsuit challenging the agency's refusal to act. Rejecting the agency's argument that existing protections

9

are adequate for the species, the Court explained that, "even with these safeguards, the Services *own* documents show that its failure to revise the critical habitat designation has caused the bird to suffer prejudice." Biodiversity Legal Foundation v. Norton, 285 F. Supp. 2d 1, 15 (D.D.C. 2003). Recognizing "the precarious position of the bird and the pressing need to revise its critical habitat," as well as the agency's decision in the 1999 Recovery Plan that the critical habitat must be revised, and "'should, at a minimum, include habitat west of Shark River Slough,'" the Court found the agency's delay to be unreasonable, and ordered the agency to set a timetable for pursuing the critical habitat revision that the agency itself had determined was necessary. Id.

      25.    As a result of those proceedings the agency was required to make a final revised critical habitat designation no later than October 2007. Although the agency asked the Court to extend this deadline, the Court refused, explaining that, "[a]ccording to the [FWS's] own forecast, the bird has about one decade left before it becomes extinct." Order of July 18, 2007 at 6. As the Court noted, "action is required now if the bird is to survive." Id.

      26.    The FWS issued a proposed revision of critical habitat for the Sparrow in October 2006. 71 Fed. Reg. 63,980. The proposal identified six critical habitat units, totaling more than 150,000 acres. Two of those units – totaling more than 70,000 acres – were located west of Shark River Slough, and were deemed essential to the conservation of the species. Id. at 63,985. The first unit is the largest remaining contiguous patch of marl prairie habitat with the potential to support a large population of Sparrows west of the Slough, and, as the Service explained, is unlikely to be affected by any fire impacts that might occur east of the Slough. Id. at 63,990. As for the second unit – containing the only remaining large area of suitable Sparrow habitat within

the cordgrass marsh – the Service explained that it may become a refugia for Sparrows if other areas are affected by fires or other damaging hyrdologic conditions.  Id. at 63,991.

27. The Service issued its final critical habitat decision in November 2007.  72 Fed. Reg. 62,736.  In the final decision, however, the agency <u>excluded</u> the two areas west of Shark River Slough, reduced the critical habitat designation by more than 70,000 acres, and left no critical habitat at all within Big Cypress National Preserve.  The end result was that although the Service has for decades recognized that the original 1977 critical habitat designation was inadequate to conserve the species, and that critical habitat must be designated west of Shark River Slough, the agency has instead reduced the <u>original</u> designation by almost 60%, to 84,000 acres, and has excluded all habitat west of the Slough.

28. In excluding these areas the Service claimed that designating critical habitat would somehow impede implementation of the so-called Comprehensive Everglades Restoration Plan ("CERP"), apparently because that Plan may result in "adverse modification" of the areas to the detriment of the species.  16 U.S.C. § 1536(a)(2).  Yet the agency claimed, paradoxically, and based on sheer speculation, that the CERP – which is still being developed – would somehow benefit the species over the long term.

29. The FWS also asserted that new research suggests that the areas west of Shark River Slough "may not have historically supported the habitats sparrows use today," and that the benefits of excluding these areas otherwise outweighed the benefits of including them.

E. **Plaintiffs' Sixty-Day Notice Letter**

30. Because the decision to exclude these areas from critical habitat is directly contrary to the agency's own earlier findings, and the rationales put forward by the agency are

impossible to reconcile with the ESA, in June 2008 plaintiffs sent defendants a formal notice letter pursuant to Section 1540(g) of the ESA.  16 U.S.C. § 1540(g).  Plaintiffs attached to that letter the comments of Dr. Stuart Pimm, the leading scientific expert studying on the Sparrow.  Dr. Pimm explained that:

> [t]he final designation of Critical Habitat for the [Sparrow] is inept, ignores peer-reviewed science, embraces wholly unsupported and unavailable documents speculating on possible future and past scenarios, and includes a trite economic analysis.  By reversing its earlier sensible proposal, this revision tacitly accepts massive damage to nearly a thousand square kilometers of our most important national wetland park and risks the extinction of a Federally-listed Endangered Species.

31. Dr. Pimm further explained that the Service's conclusion that the area west of Shark River Slough does not contain suitable Sparrow habitat conflicts with the scientific literature, and that the agency's economic analysis was also patently flawed.  In fact, Dr. Pimm explained, the area west of Shark River Slough is essential to the species' survival and recovery – as the Service itself had recognized for many years – and the Service's conclusion that excluding these critical habitat areas would not result in the extinction of the species ignores the best available science.

32. The FWS never responded to plaintiffs' notice letter.

## PLAINTIFFS' CLAIMS FOR RELIEF

### CLAIM ONE

### (ESA)

33. By issuing a revised critical habitat designation that excludes habitat essential to the Sparrow's survival and recovery, and particularly habitat west of Shark River Slough,

defendants have disregarded the best available science and instead relied on conjecture and speculation, in violation of the ESA, 16 U.S.C. § 1533(b)(2), and the APA.  5 U.S.C. § 706.

34.     These legal violations are injuring Plaintiffs in the manner described in paragraphs 3-6 above.

## CLAIM TWO

### (APA)

35.     By failing to designate critical habitat in areas where the agency determined at least ten years ago that such designation was necessary, the FWS is acting arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2); flouting this Court's ruling in BLF I; and unlawfully withholding and unreasonably delaying agency action in violation of the APA.  5 U.S.C. § 706(1).

36.     These legal violations are injuring Plaintiffs in the manner described in paragraphs 3-6 above.

Wherefore, Plaintiffs respectfully request that this Court:

(1)     declare that defendants have violated the ESA and the APA;

(2)     set aside and remand the Service's 2007 Critical Habitat determination for the Sparrow, 72 Fed. Reg. 62,736;

(3)     reinstate the prior critical habitat for the species until such time as a new critical habitat determination is made;

(4)     order the agency to make a new final critical habitat determination that complies with the ESA and the APA within sixty days;

(5) award Plaintiffs their costs, attorneys' fees, and other disbursements for this action, including any expert witness fees; and

(6) grant Plaintiffs such other and further relief as this Court may deem just and proper.

Respectfully Submitted,


 /s/ Howard M. Crystal
Howard M. Crystal (D.C. Bar No. 446189)


 /s/ Eric R. Glitzenstein
Eric R. Glitzenstein (D.C. Bar No. 358287)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C. 20009
(202) 588-5206

October 27, 2009

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al. ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> KENNETH SALAZAR, Secretary ) <br> U.S. Department of the Interior, et al. ) <br> ) <br> Defendants. ) <br> ) | No. 09-1684 (RMC) |

**CERTIFICATE OF SERVICE**

    I, Howard Crystal, certify that I served the foregoing Amended Complaint, via email and U.S. mail, this 27th day of October 2009 to the following:

Mark Arthur Brown
Senior Trial Attorney
United States Department of Justice
Wildlife and Marine Resources Section
601 D St., N.W. Room 3036
Washington, DC 20004
mark.brown@usdoj.gov


                                            */s/ Howard M. Crystal*
                                            Howard M. Crystal